UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| HOLT TEXAS, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | SA-24-CV-822-FB (HJB) |
| | § | |
| PRECISION POWER SOURCE, LLC, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendant's Motion to Dismiss for Lack of Personal Jurisdiction Under Federal Rule of Civil Procedure 12(b)(2).  (Docket Entry 9.)  Pretrial matters have been referred to the undersigned.  (Docket Entry 13.)  For the reasons set out below, I recommend that Defendant's motion (Docket Entry 9) be **DENIED**.

**I.      Jurisdiction.**

Plaintiff Holt Texas, Ltd. ("Holt"), a Texas citizen, raises state-law claims and seeks damages in excess of $75,000 from Defendant Precision Power Source, LLC ("Precision"), a citizen of Illinois.  (Docket Entry 1, at 2.)  The Court has original jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1332.  I have the authority to issue this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1).

**II.     General Background.**

This case arises from an alleged breach of contract and various warranties.  (Docket Entry 1, at 6–10.)  Holt is a Texas limited partnership that "manufactures, assembles, and sells . . . commercial and industrial generator systems" ("gensets").  (*Id.* at 1–2.)  Precision is an Illinois-

based limited liability company that manufactures and sells "sound attenuated enclosures for [gensets]" ("enclosures"). (*Id.*; Docket Entry 9-1, at 2.)

On January 30, 2020, Precision contracted with Vanjen Group ("Vanjen"), a Texas citizen, to be "its exclusive sales representative for all accounts" in Texas. (Docket Entry 17-1, at 15–16, 41–44; Docket Entry 17-2, at 2–4.) Vanjen facilitated discussions between Precision and Holt. (Docket Entry 17-3, at 1; Docket Entry 25-1, at 21–22.) At Vanjen's request, Precision "sent written quotes to [Holt] from Peoria, Illinois, for the fabrication and construction of enclosures for gensets." (Docket Entry 9-1, at 3; Docket Entry 25-1, at 19–22.) Representatives of Holt and Vanjen traveled to Illinois to negotiate an agreement with Precision for the provision of genset enclosures. (Docket Entry 25-1, at 27.) Holt and Precision entered into a contract on December 20, 2021. (Docket Entry 17-3, at 1; Docket Entry 25-1, at 30.) Precision's employees never traveled to Texas during the course of the negotiations or of its contractual relationship with Holt. (Docket Entry 25-1, at 28–30.)

Pursuant to the parties' agreement, Precision designed enclosures for Holt's gensets and then sent those designs to Texas for Holt's approval. (Docket Entry 26, at 3; Docket Entry 25-1, at 34–35.) Once Holt approved the designs, Precision manufactured the enclosures at its factory in Illinois. (Docket Entry 26, at 3; Docket Entry 25-1, at 23–24.) While most of the materials were locally sourced by Precision, Holt had "the exhaust components" delivered to Precision from a company in Texas. (Docket Entry 25-1, at 30–31; 84–85.) In the regular course of dealing between the parties, Holt arranged for delivery trucks to retrieve the completed enclosures from Precision's facility in Illinois and transport them directly to Holt's customers in states across the country, including Texas. (Docket Entry 17-3, at 1; Docket Entry 25-1, at 38–40.)

Eventually the parties' contractual relationship soured.  On July 24, 2024, Holt filed suit, asserting claims for breach of contract, breach of an express warranty for services, breach of an express warranty for goods, and breach of implied warranties of merchantability and fitness for a particular purpose.  (Docket Entry 1, at 6–10.)  Precision was served on August 15, 2024 and, after receiving an extension of time to respond, filed the present motion to dismiss for lack of personal jurisdiction.  (Docket Entries 6–9.)  Holt and Precision filed a response and reply (Docket Entries 17 and 18, respectively), and supplemental briefing (Docket Entries 25 and 26, respectively).

## III.    Legal Standard.

"The plaintiff has the burden of establishing that the court has personal jurisdiction." *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 211 (5th Cir. 2016).  To carry that burden, a plaintiff need only "make a prima facie showing." *Id.*  This is a "liberal standard." *Van Rooyen v. Greystone Home Builders, LLC*, 295 F. Supp. 3d 735, 742 (N.D. Tex. 2018).  "Proof by a preponderance of the evidence is not required." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  In determining whether a plaintiff has satisfied its burden, "the court may review pleadings, affidavits, interrogatories, depositions, oral testimony, exhibits, any part of the record, and any combination thereof." *Int'l Truck & Engine Corp. v. Quintana*, 259 F. Supp. 2d 553, 556 (N.D. Tex. 2003) (citing *Command-Aire Corp. v. Ontario Mech. Sales & Serv., Inc.*, 963 F.2d 90, 95 (5th Cir. 1992)).  "Any genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of plaintiff for the purposes of determining whether a prima facie case exists." *Int'l Truck*, 259 F. Supp. 2d at 557 (citing *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1067 (5th Cir. 1992)).

## IV.    Discussion.

Personal jurisdiction may be either specific or general; here, Holt argues that the Court has specific personal jurisdiction over Precision.  (Docket Entry 17, at 3–7.)  To establish specific jurisdiction over an out-of-state defendant, a plaintiff must show two things—"*first*, that minimum contacts exist between the defendant and the state; and *second*, that the harm alleged arises out of or relates to . . . [those] contacts."  *Thomas v. Life Protect 24/7 Inc.*, 559 F. Supp. 3d 554, 561 (S.D. Tex. 2021) (citing *Bulkley & Assocs. LLC v. Dep't of Indus. Rels., Div. of Occupational Safety and Health of the State of Cal.*, 1 F.4th 346, 351 (5th Cir. 2021)).  Once a plaintiff has demonstrated minimum contacts and relatedness, "the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable."  *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (citation omitted).  "Such a showing must be 'compelling.'"  *Thomas*, 559 F. Supp. 3d at 561 (quoting *Sangha v. Navig8 Ship Mgmt. Priv. Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018)).

In this case, the minimum-contacts and relatedness inquiries are intertwined; accordingly, this Report and Recommendation considers them together.  It then turns to the question of fairness.

### A.    *Minimum Contacts and Relatedness.*

 "For there to be minimum contacts, a defendant must have purposefully availed itself of the benefits and protections of the forum state such that it should reasonably anticipate being haled into court there."  *Bluestone Partners, LLC v. Lifecycle Constr. Servs., LLC*, 642 F. Supp. 3d 560, 565 (E.D. Tex. 2022) (quoting *Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019)) (internal quotation marks omitted).  To demonstrate purposeful availment, the plaintiff "must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploit[ing] a market' in the forum State or entering into a contractual relationship centered there."  *Ford Motor*

*Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).  Although "different tests for minimum contacts" can apply "to different types of claims," in this case Plaintiff's breach-of-warranty claims are subject to the same framework used for its breach-of-contract claim.  *Ellison v. Daldalyan*, No. 4:22-CV-02271, 2023 WL 2277127, at *4, *7 (S.D. Tex. Feb. 28, 2023).  For breach of contract claims "'only those acts which relate to the formation of the contract and the subsequent breach are relevant,' including 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'"  *Danziger & De Llano L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 500 (5th Cir. 2022) (quoting *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 (5th Cir. 2018)) (internal quotation marks omitted).  These factors are considered below.

*Formation of the contract.*  One of the factors the Court must consider in determining whether it has personal jurisdiction over Precision is where the parties negotiated their contract. *Danziger*, 24 F.4th at 500.  Based on the materials presented by the parties, it appears that the terms of the contract were negotiated in person in Illinois—not Texas.  (*See* Docket Entry 25-1, at 27, 30.)  This does not resolve this factor in Precision's favor, however, as contract discussions were *initiated* in Texas by Vanjen, Precision's "exclusive sales representative" in Texas.  (Docket Entry 17-1, at 15–16; Docket Entry 17-2, at 3–4; Docket Entry 17-3, at 1; Docket Entry 25-1, at 21–22.) This is hardly surprising, as Precision's sales agreement with Vanjen expressly and specifically contemplated that Vanjen would drum up business for Precision *in Texas*, among other states. (Docket Entry 17-1, at 15–16.)  Indeed, the agreement with precision required Vanjen to "maintain a proper sales office" and "staff" in Texas.  (*Id.* at 16.)

Pursuant to its agreement with Precision, when Vanjen learned that Holt needed genset enclosures, it passed this information on to Precision, which then "sent written quotes to [Holt]

5

from Peoria, Illinois, for the fabrication and construction of enclosures." (Docket Entry 9-1, at 3; Docket Entry 25-1, at 19–22.) And when Holt traveled from Texas to Illinois to negotiate the terms of the parties' contract, it was accompanied by Vanjen as Precision's Texas liaison. (Docket Entry 25-1, at 27.) All of this tends to suggest that Holt's presence in Texas was "instrumental in the formation of the contract." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).

*The terms of the contract and the parties' anticipated future consequences.* Remarkably, the parties have not produced any copies of a signed, written contract. Precision has instead produced an unsigned document entitled "Standard Terms and Conditions." ("ST&C"). (Docket Entry 26-1.) The ST&C purports to "exclusively . . . govern" any sale of goods to a generic "Buyer," with no mention of Holt. (*Id.* at 1.) Regarding delivery, Precision's ST&C provides that "[a]ll goods are sold F.O.B. at Seller's plant." (*Id.*) *See Free On Board*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[A] mercantile-contract term allocating the rights and duties of the buyer and the seller with respect to delivery, . . . whereby the . . . buyer must arrange for transportation . . . . [and] [t]he seller's delivery is complete (and the risk of loss passes to the buyer) when the goods pass into the transporter's possession."). According to Precision, the F.O.B. clause in its unsigned ST&C means that its contractual duties were complete once it loaded the enclosures onto the delivery trucks paid for and arranged by Holt. (Docket Entry 26, at 2–3.) Precision therefore concludes that none of its contractual obligations extend beyond Illinois and into Texas. (*Id.*)

Assuming that the ST&C represents the terms of the parties' contract, Precision's conclusion does not follow. After all, the ST&C also states that "Seller agrees to further warrant enclosure and fuel tank structural modifications, made at site for a period of 5 years from date of commissioning." (Docket Entry 26-1, at 2.) This is corroborated by the declaration of Christopher Gibson, Holt's National Account Engineering Manager, which states that Precision "had

contractual warranty obligations to Texas customers and Holt." (Docket Entry 17-3, at 2.) Thus, one of the anticipated future consequences of the ST&C's express terms would be that Precision would provide additional parts or services to Holt or its customers at their locations in Texas.

*Course of dealing.* The parties' actual course of dealing confirms Precision's contractual obligations outside of Illinois. Precision actually did—on at least two occasions—travel to other states to "assist with the maintenance or repair of genset enclosures." (Docket Entry 25-1, at 36–37.) If Precision's warranty obligations took it to Holt's out-of-state worksites from time to time, then it could reasonably anticipate being called to Holt's Texas-based sites as well. And while Precision may not have actually sent people to Texas to perform such repairs or maintenance on-site, it "periodically shipped parts, components[,] and/or supplies to Holt in Texas." (Docket Entry 17-3, at 2.) This is borne out by various email exchanges, including one with the subject line "RE: CyrusOne Austin [Texas] – Missing/Short Shipped Items," in which a Holt employee told Precision that he "received a call . . from [Holt's] techs in Austin[, Texas]," complaining about missing parts. (Docket Entry 17-6, at 1.) In another email, with the subject line "Cyrus Battery Cables," Precision assured Holt's project manager that Vashawn Young, one of Precision's owner-members, would personally "send the [missing] parts on Friday to Austin[, Texas]." (Docket Entry 17-5, at 1.) At his deposition, Young testified that he vaguely remembered personally sending some keys to a job site—potentially the CyrusOne site in Austin, Texas—and that Precision may have sent missing parts to such sites, albeit on Holt's dime—"through Holt's Fedex account." (Docket Entry 25-1, at 38.)

Two other details from the parties' actual course of dealing further tie Precision to Texas. First, Precision ordered certain exhaust components from a company in Texas, the delivery of which was coordinated by Holt. (Docket Entry 25-1, at 34.) Second, the order of operations in

the parties' dealings was that Holt would send the "specification[s] of what [it] needed" to Precision from Texas. (Docket Entry 25-1, at 35; *see* Docket Entry 26, at 3.) Precision would then do "[a]ll the design work" in Illinois, and then "send the design[s]" to Holt "for approval." (Docket Entry 25-1, at 35; *see* Docket Entry 26, at 3.) Precision would not begin manufacturing any enclosures, then, until Holt had received and approved its design proposals in Texas. (Docket Entry 25-1, at 35; *see* Docket Entry 26, at 3.)

Based on the foregoing, the Court should find that Holt has satisfied its burden of demonstrating that Precision had sufficient minimum contacts with Texas and that such contacts were related to its contract and related warranties with Holt. In making this recommendation, the undersigned notes that Plaintiff is only required to "make a prima facie showing" of personal jurisdiction, *Int'l Energy Ventures*, 818 F.3d at 211—a "liberal standard," *Van Rooyen*, 295 F. Supp. 3d at 742, for which "[p]roof by a preponderance of the evidence is not required," *Johnston*, 523 F.3d at 609—and that "[a]ny genuine, material conflicts between the facts established by the parties' affidavits and other evidence are resolved in favor of [P]laintiff for purposes of determining whether a prima facie case exists," *Int'l Truck*, 259 F. Supp. 2d at 556.

**B.  *Fairness.***

As Holt has met its burden of showing minimum contacts and relatedness, the burden now shifts to Precision show that subjecting it to jurisdiction in Texas "would be unfair or unreasonable." *Seiferth*, 472 F.3d at 271. In making this determination, courts must balance "(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies." *E. Concrete Materials, Inc. v. ACE Am. Ins. Co.*, 948 F.3d 289, 298 (5th Cir.

2020). Here, the burden on Precision is a heavy one; its showing of unfairness must be "compelling." *Thomas*, 559 F. Supp. 3d at 561 (quoting *Sangha*, 882 F.3d at 102).

Precision challenges the fairness or reasonableness of jurisdiction with just two sentences. First, it asserts that subjecting it to jurisdiction in Texas would impose a heavy burden because "it has no business in San Antonio, or elsewhere in Texas." (Docket Entry 9, at 8.) The undersigned agrees that this would be a burden—defending any lawsuit as an out-of-state defendant is always burdensome. However, absent additional facts, arguments, or legal authority, Precision has not shown that the burden is a "heavy" one. After all, it appears that witnesses to the formation of the contract and its alleged breach would come from both states.

Second, Precision argues that "Texas has no significant interest in the outcome of the dispute, as the contract was not performed in Texas, the enclosures are not even located in Texas, and there are no social policies implicated by the contract." (Docket Entry 9, at 8.) Precision's assertion that the contract was not performed in Texas is undermined by the evidence described above, which shows that Precision arranged for parts to be delivered in Texas and had warranty obligations to perform maintenance and repairs in Texas, if needed. And its assertion that none of the enclosures were in Texas is incorrect—several of Precision's enclosures were sent to sites in Austin and San Antonio. (*See* Docket Entry 17-4, at 1–17; Docket Entry 17-5–7.)

Finally, Precision's assertion that this case implicates no social policies is merely conclusory, and arguably inaccurate: Texas has a strong interest in the reliability of contracts that undergird power delivery for its data centers.[1] In any event, neither this argument nor Precision's

---

[1] *See, e.g.*, Kayla Guo, *Data Centers are Booming in Texas[:] What Does that Mean for the Grid?*, THE TEXAS TRIBUNE, (Jan. 24, 2025) https://www.texastribune.org/2025/01/24/texas-data-center-boom-grid/ (last visited May 29, 2025); *The Data-Centre Investment Spree Shows No Signs of Stopping: Demand for Processing Power Will Continue to Outpace Supply*, THE

other assertions are sufficient to make a "compelling" showing that subjecting it to the Court's jurisdiction would be unfair or unreasonable. *See Sangha*, 882 F.3d at 102; *Thomas*, 559 F. Supp. 3d at 561.

## V.    Recommendation.

For the foregoing reasons, I recommend that Precision's Motion to Dismiss for Lack of Personal Jurisdiction (Docket Entry 9) be **DENIED**.

## VI.    Notice of Right to Object.

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Report and Recommendation must be filed **within 14 days** after being served with a copy of the same, unless this time period is modified by the District Court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties.  An objecting party must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "objections that are frivolous, conclusory, or general in nature needn't be considered." *Williams v. Lakeview Loan Serv. LLC*, 694 F. Supp. 3d 874, 881 (S.D. Tex. 2023) (citing *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo*

---

Economist, (Feb. 5, 2025) https://www.economist.com/business/2025/02/05/the-data-centre-investment-spree-shows-no-signs-of-stopping (last visited May 29, 2025).

review by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

     **SIGNED** on June 2, 2025.

_____<br>
Henry J. Bemporad<br>
United States Magistrate Judge